IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES OF AMERICA

    Plaintiff,

v.                          Case No: 6:09-cv-1911-Orl-18GJK

KAMAN PRECISION PRODUCTS, INC.,
f/k/a KAMAN DAYRON, INC.,

    Defendant.
_____/

## AMENDED COMPLAINT

Plaintiff, the United States of America ("United States"), sues Defendant, Kaman Precision Products f/k/a KAMAN DAYRON, INC., ("KDI") and alleges:

### PARTIES, JURISDICTION, AND VENUE

1. This action is pursuant to the False Claims Act, 31 U.S.C. §3729 *et seq*.; and under common law for breach of contract, unjust enrichment, and payment by mistake.

2. The United States of America ("United States" or "government") files this lawsuit on behalf of the Department of the Army, an agency and instrumentality of the United States.

3. KDI is a contractor with its principal place of business in Orlando, Florida.

4. This court has jurisdiction pursuant to 28 U.S.C. §1345, providing original jurisdiction for lawsuits commenced by the United States, and under 28 U.S.C. §1331 and 31 U.S.C. §3732(a).

5. Venue for this action is proper in the Middle District of Florida pursuant to 28

U.S.C. §1391(b) and 28 U.S.C. §3732(a).

## FACTS

6. In 1996, the U.S. Army entered into contract DAAA09-96-C-0015 ("the contract") with Dae Shin Enterprises, Inc., d/b/a Dayron. In 2002, Dayron was purchased by Kaman and became KDI. KDI assumed contract number DAAA09-96-C-0015. In 2008, KDI changed its name to Kaman Precision Products, Inc, but remained obligated under contract number DAAA09-96-0015 by virtue of a modification of the contract made on November 5, 2008.

7. The contract was for a quantity of FMU-143 fuzes that were to be used in hard target penetration warheads, colloquially referred to as "bunker buster bombs."

8. The contract was modified several times over the years and eventually grew to more than $20 million. This contract was in effect between the United States and KDI at the time of the events giving rise to this action.

9. FMU-143 fuzes consist of several components, including a component known as the bellows motor. The bellows motor rotates a portion of the fuze assembly to arm the fuze.

10. In 1997, it was discovered that the EB 401-1 bellows motor designated for use in the FMU-143 fuze was over-energetic, meaning that its powder charge was too powerful for the fuze. The over-energetic bellows motor caused the detonator in the fuze to fire unpredictably, often shortly after the fuze was armed. This created a hazard to personnel using the fuze and created a potential for premature and other misfires of the warhead.

11. KDI, working with its bellows motor supplier, Eagle Picher, developed a new

bellows motor for use in the FMU-143 fuze. This new bellows motor was given part number EB 401-2.

12. In 1998, the military approved KDI's request for deviation ("RFD") to contract number DAAA09-96-C-0015. (RFD 0015-D-008R1). The RFD was identified as "urgent" and "major" and stated it was "to revise the bellows to include unique FMU-143 requirements." The RFD specified using the EB 401-2 bellows motor in the FMU-143 fuze.

13. In 2000, the parties signed modification 14, incorporating RFD 0015-D-008R1 into the contract for the fuzes. As a result of the modification, the EB 401-2 bellows motor was specified for use in the FMU-143 fuze.

14. Throughout this time, Dayron and, then KDI, through another contract with the Air Force, supplied another fuze for use in a different hard target penetration warhead. The other fuze had part number FMU-152.

15. The FMU-152 used an EB 401-3 bellows motor, which has a proprietary powder charge mixture weighing 71-74 mg. This charge is close to the powder charge in the EB 401-1 bellows motor originally used in the FMU-143 fuze and found to be over-energetic. The EB 401-2 bellows motor contractually-specified for the FMU-143 fuze used a powder charge approximately 50 percent less than the powder charge in the EB 401-3 used for the FMU-152.

16. The EB 401-2 and EB 401-3 bellows motors appear identical to the naked eye. However, the motors are different and intended for different fuzes. In addition to having different powder charges, the two motors have different parts numbers, were ordered by KDI through separate purchase orders, and were stored in

different areas of KDI's facility.

17. On January 15, 2003 and January 30, 2003, KDI ordered EB 401-2 bellows motors from its supplier, Eagle Picher, for use in FMU-143 fuzes that KDI was scheduled to ship in June and July 2003.

18. KDI's supplier was not able to fill the orders for the EB 401-2 bellows motors, creating a situation where KDI would have to shut down or reduce its production of FMU-143 fuzes and possibly not be able to timely meet its contractual obligations to provide the fuzes.

19. Larry Streit, KDI's Materials Manager, acting on behalf of KDI, went to the area of KDI's facility where the 401-3 bellows motors for the FMU-152 fuzes were stored, took some of those fuzes, and put them in the bins where EB 401-2 bellows motors were kept for FMU-143 fuzes.

20. Streit, acting on behalf of KDI, also went into KDI's computer system and changed the parts numbers to make it appear that KDI was using EB 401-2 bellows motors for the FMU-143 fuzes that KDI would ship pursuant to the contract.

21. KDI proceeded to put 401-3 bellows motors into some of the FMU-143 fuzes it was building to supply to the United States under the contract.

22. KDI knew that it substituted non-conforming fuzes but did not report or disclose the substitution at the time that it occurred. KDI did not request a change order, deviation, or other authorization to make the substitution and lacked any authorization to make the substitution.

23. Nonconforming bellows motors were placed in some or all of 1,081 FMU-143

fuzes shipped by KDI between June 5, 2003 and July 25, 2003, under lots G052-001, G046-003, D046-001 and F046-002.

24. Each lot was accompanied by an Invoice Copy DD Form 250 and a Certificate of Conformance. The Certificate of Conformance stated, among other things, that the accompanying lot "conforms with all requirements of the contract," "[t]he items covered by this certificate perform to all contract requirements," and "[t]his certificate is made for the purpose of inducing payment and with knowledge that the information and certification may be used as a basis for payment." The certificates were signed by Robert Monahan, KDI's Quality Assurance Manager.

25. The contract states that a DD Form 250 must be submitted with all requests for payment pursuant to DOD FAR Supp., Appendix F, Part 4. This section of FAR states: "Payment by Defense Finance and Accounting Service, Columbus Center will be based on the source acceptance copies of DD Forms 250 forwarded to the contract administration office."  KDI's requests for payment included DD Form 250s stamped "Invoice Copy."

26. Certificates of Conformance were prepared by KDI and expressly represented compliance with contract requirements.

27. Invoice Copy DD Form 250's and Certificates of Conformance prepared by KDI were submitted to the government for the purpose of obtaining payment.

28. By submitting the "Invoice Copy" DD Form 250's and Certificates of Conformance, KDI expressly and implicitly represented compliance with contract requirements despite its knowledge that the fuzes did not comply with contract requirements.

29. An Invoice Copy DD Form 250 and Certificate of Conformance for Lot GO46-003 was signed by Robert Monahan, KDI's Quality Assurance Manager on July 24, 2003 and submitted by KDI for payment by the government. Payment was made by the government on August 19, 2003.

30. An Invoice Copy DD Form 250 and Certificate of Conformance for Lot GO52-001 was signed by Robert Monahan, KDI's Quality Assurance Manager on July 24, 2003 and was submitted by KDI for payment by the government. Payment was made by the government on December 30, 2003.

31. An Invoice Copy DD Form 250 and Certificate of Conformance for Lot FO46-002 was signed by Robert Monahan, KDI's Quality Assurance Manager on June 25, 2003 and was submitted by KDI for payment by the government. Payment was made by the government on July 21, 2003.

32. An Invoice Copy DD Form 250 and Certificate of Conformance for Lot DO46-001 was signed by Robert Monahan, KDI's Quality Assurance Manager on May 22, 2003 and was submitted by KDI for payment by the government. Payment was made by the government on June 6, 2003.

33. At the time each request for payment was submitted, KDI knew that the fuzes did not comply with contract requirements and knew that the Certificates of Conformance were false.

34. The United States relied on the DD Form 250's and Certificates of Conformance prepared by KDI to make payment of $2,004,499 for lots G052-001, G046-003, D046-001 and F046-002.

35. On August 18, 2004, Paul Harrison, a Defense Contract Management Agency

("DCMA") Orlando Quality Assurance Specialist ("QAS"), discovered the substitution of the EB 401-3 bellows motors for the EB 401-2 bellows motors in the fuzes shipped between June 5, 2003 and July 25, 2003.

36. KDI subsequently acknowledged the substitution in September 2004.

37. The Army, Air Force, and the Navy concurred that substitution of the EB 401-3 bellows motors for the EB 401-2 bellows motor in the FMU-143 fuzes created a potential for fuzes firing upon being armed or earlier than required or expected. That is, the extra energy in the fuze could cause early or unpredictable detonation of the attached warhead. The service representatives concluded that use of the fuzes could cause critical injury or death to service personnel, damage to government property, and misfires that could result in waste or failure to achieve tactical goals.

38. The FMU-143 fuzes are sealed as part of the finishing process. Because of the seal, it was not possible for the United States to determine which fuzes had over-active EB 401-3 bellows motors installed in them.

39. The United States requested KDI assist in identifying which fuzes were installed with the EB 401-3 bellows motors. KDI was unable to identify which fuzes were installed with the EB 401-3 bellows motors.

40. Therefore, all 1,081 fuzes supplied between June 5, 2003 and July 25, 2003 were quarantined.

41. The military has attempted to rework the defective fuzes to create usable ones. The cost of this effort exceeds $3 million to date.

## COUNT I
## False Claims Act, 31 U.S.C. §3729(a)(1)

42. The allegations in paragraphs 1 - 41 are re-alleged and incorporated by reference.

43. The False Claims Act, 31 U.S.C. §3729(a)(1), imposes liability on any person who:

- knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a members of the Armed forces a false or fraudulent claim for payment or approval.

44. For the purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' mean that a person, ... (1) has knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information and no proof of specific intent to defraud is required." 31 U.S.C. §3729(b).

45. KDI knowingly submitted false claims to the United States when it requested or demanded payment for 1,081 FMU-143 fuzes shipped between June 5, 2003 and July 25, 2003.  The DD Form 250's and Certificates of Conformance accompanying these fuzes expressly and implicitly represented compliance with contract requirements for the EB 401-2 bellows motors.

46. KDI knew that the information in the DD Form 250's and Certificates of Conformance accompanying each lot of fuzes was false when it submitted them.

47. In the alternative, KDI acted in deliberate ignorance of the truth or falsity of the lack of compliance or in reckless disregard of the truth or falsity of the lack of compliance.

48. KDI intended that the United States rely on the DD250s and Certificates of Conformance submitted with the fuze shipments.

49. The United States relied on the DD250s and Certificates of Conformance submitted with the fuze shipments and was damaged by the false claims. These damages include the amounts paid for the fuzes, which have no value as supplied.

50. KDI submitted four separate false claims to the United States.

WHEREFORE, the United States requests that the Court:

- Enter a judgment against KDI for the amount of damages and penalties permitted by law, plus all costs and interest to which the United States may be entitled.

## COUNT II
## False Claims Act, 31 U.S.C. §3729(a)(2)

51. The allegations in paragraphs 1 - 41 are re-alleged and incorporated by reference.

52. The False Claims Act, 31 U.S.C. §3729(a)(2), imposes liability on any person who:

- knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

53. To obtain payment from the United States, KDI knowingly made, used, or caused to be used false records or statements. KDI knew that the information in the Invoice Copy DD Form 250's and Certificates of Conformance accompanying each lot of fuzes was false when it submitted them.

54. In the alternative, KDI acted in deliberate ignorance of the truth or falsity of the

lack of compliance or in reckless disregard of the truth or falsity of the lack of compliance.

55. KDI intended that the United States rely on the Invoice Copy DD Form 250's and Certificates of Conformance accompanying each of the fuze shipments.

56. The United States relied on the Invoice Copy DD Form 250's and Certificates of Conformance accompanying each of the fuze shipments and was damaged by these false statements. These damages include the amounts paid for the fuzes, which have no value as supplied.

57. KDI submitted eight separate false statements or records to the United States.

WHEREFORE, the United States requests that the Court:

- Enter a judgment against KDI for the amount of damages and penalties permitted by law, plus all costs and interest to which the United States may be entitled.

### Count III
### Breach of Contract

58. The allegations in paragraphs 1 - 41 are re-alleged and incorporated by reference.

59. KDI breached contract DAAA09-96-C-0015, as modified by RFD 0015-D-008R1, when it supplied FMU-143 fuzes with EB 401-3 bellows motors.

60. The government was damaged by the breach both in the amounts it paid for the non-conforming fuzes and the amount that it has spent attempting to rework the fuzes.

WHEREFORE, the United States requests that the Court enter a judgment against KDI for all damages suffered by the government as a result of the breach

of contract and order all other relief that it deems appropriate.

## Count IV
## Contract Implied in Law (Unjust Enrichment)

61. The allegations in paragraphs 2, 3, 5 are re-alleged and incorporated by reference.

62. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1345.

63. This is an action for an contract implied in law and is pleaded in the alternative to the counts stated above.

64. The United States conferred a benefit on KDI, KDI was aware of the benefit, KDI accepted and retained the benefit, and the circumstances are such that it would inequitable for KDI to accept the benefit without paying the fair value thereof.

65. More specifically, the United States paid $2,004,499 for a large quantity of FMU-143 fuzes containing EB 301-2 bellows motors. These fuzes were provided by KDI in lots G052-001, G046-003, D046-001 and F046-002, which were supplied to the United States between June 5, 2003 and July 25, 2006.

66. KDI caused the United States to believe, and the United States believed, that the fuzes supplied in these lots contained EB 301-2 bellows motors.

67. KDI knew that the United States expected – and needed – the FMU-143 fuzes in lots G052-001, G046-003, D046-001 and F046-002 to contain EB 301-2 bellows motors so that the fuzes could be used in "bunker buster" bombs.

68. The United States conferred a substantial benefit on KDI based on its belief that the FMU-143 fuzes in lots G052-001, G046-003, D046-001 and F046-002 contained EB 301-2 bellows motors. Specifically, the United States paid KDI $2,004,499 for lots G052-001, G046-003, D046-001 and F046-002.

69. KDI accepted and retained this benefit.

70. At the time that KDI accepted and retained the benefit bestowed on it by the United States for lots G052-001, G046-003, D046-001 and F046-002, all the FMU-143 fuzes did not contain EB 301-2 bellows motors and was not possible for the United States or KDI to determine which fuzes contained EB 301-2 bellows motors and which did not.

71. All fuzes had to be quarantined because of the potential risk to service persons and government equipment, including service personnel that would load and arm "bunker buster" bombs containing FMU-143 fuses with other than EB 301-2 bellows motors.

72. It was inequitable for KDI to accept and retain the benefits provided by the United States and, at the same time, fail to provide FMU-143 fuzes containing EB 301-2 motors.

73. KDI was unjustly enriched by its acceptance and retention of the benefits conferred by the United States without providing its FMU-143 fuzes containing EB 301-2 motors.

74. The court should imply a contract in law and require KDI to pay the fair value for the benefit it received from the United States.

WHEREFORE, the United States requests that the Court enter a judgment against KDI requiring it to repay all money that it received and which it was not entitled to receive, and order all other relief that it deems appropriate.

Respectfully submitted,

A. BRIAN ALBRITTON
United States Attorney

By: /s/Bradley M. Bole
Bradley M. Bole
Assistant United States Attorney
Florida Bar No. 0371009
501 W. Church Street, Suite 300
Orlando, Florida 32805
Telephone: (407) 648-7514
Facsimile: (407) 648-7588
Email: Bradley.Bole@usdoj.gov

Of counsel:

Stanley E. Alderson
United States Department of Justice
Trial Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of the filing to the following CM/ECF participants:

aliu@crowell.com
sweinberg@zuckerman.com
nhasbun@zuckerman.com
nberman@zuckerman.com

/s/Bradley M. Bole
Bradley M. Bole
Assistant United States Attorney