**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

-vs-                                                          Case No. 6:09-cv-1911-Orl-31GJK

**KAMAN PRECISION PRODUCTS, INC.**
**formerly known as Kaman Dayron, Inc.,**

**Defendant.**

_____

**ORDER**

This cause comes before the Court without oral argument upon consideration of Defendant Kaman Precision Products, Inc.'s ("Kaman") motion for summary judgment (Doc. 65); Plaintiff United States of America's (the "Government ") response in opposition thereto (Doc. 75); and Kaman's reply (Doc. 82).

**I. Background**

This is an action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and state law. In 1996, the U.S. Army entered into contract DAAA09-96-C-00 15 (the "Contract") with Kaman[1] for the supply of FMU-143 fuzes to be used in bunker buster bombs. The Contract has been modified several times since 1996 and is now worth more than $20,000,000.00.

---

[1] The Contract was originally awarded to Dae Shin Enterprises ("DSE"). In 2002,DSE was purchased by Kaman and became Kaman Dayron, Inc. ("KDI"). KDI assumed the contract. In 2008, KDI changed its name to Kaman Precision Products, Inc. Kaman remains obligated under the Contract by the terms of a modification made on November 5, 2008.

The FMU-143 fuzes to be supplied under the Contract contain several components. One of these parts is known as the bellows motor. The bellows motor functions by rotating a portion of the fuze assembly to arm the fuze. The contract originally designated that the FMU-143 fuze would contain the EB 401-1 bellows motor.[2] In 1997, it was discovered that the powder charge in the EB 401-1 bellows motor was too powerful for the FMU-143 fuze, causing it to fire unpredictably. (*See* Gov. Resp., Ex. 11 at 4-5.) Kaman developed a new bellows motor, the EB 401-2 bellows motor, to solve this problem. Diane Cowan, Kaman's Configuration Manager, submitted a request for deviation seeking Government approval to use the newly-designed EB 401-2 bellows in the FMU-143 fuze. (*See id*. at 1.)[3] According to the description of the deviation provided by Kaman, the criteria for the bellows was changed "to produce a minimum travel distance of 45 degrees and velocity of 900 to 1900 rpm when measured at the 45 degree point of travel." (*Id*. at 2.)

In 1998, the Government approved the new bellows and the Contract was modified to require the new EB 401-2 bellows motor for the FMU-143 fuze (the modification is referred to "Mod. 14").[4] Kaman circulated notices to its engineering, quality, and production departments,

---

[2] The Contract's technical data package ("TDP") specified drawing number 1379AS781, Revision H, for the bellows motor.

[3] The request for deviation is also referred to as "RFD 0015-D-0008R1."

[4] The Contract's TDP, and accompanying drawing number 1379AS781, Revision H, remained the same.

advising that the FMU-143 fuzes needed to be built with the EB 401-2 bellows.[5] (*See* Gov. Exs. 12 & 13.)[6]

Throughout this time, Kaman and its predecessors in interest were supplying the United States Air Force with a different bellows motor, the EB 401-3, for use in a different fuze.[7] The EB 401-3 fuze demonstrated a rotational speed of 1932 to 2247 rpms when measured at the 45 degree point of travel. (*See* Gov. MSJ, Ex. 13.) In 1999, Kaman received a shipment of 1,813 EB 401-3 bellows from its supplier for the JPF program.

---

[5] The notices were prepared by Diane Cowan, Kaman's configuration manager.

[6] Larry Streit admitted to receiving notices of Temporary Deviation in 2002 and on March 20, 2003. He also admitted that the information contained in the notices was important to him as Kaman's manager of materials. (Streit Dep. at 81:20-23.)

[7] The fuze developed for the Air Force is referred to as the FMU-152 fuze or the Joint Programable Fuze ("JPF"). Although the EB 401-3 bellows motor used the basic 1379AS781 design, the drawing number was changed to 9331533.

While the EB 401-2 bellows motor and the EB 401-3 bellows motor look identical, they have different stock numbers (also referred to as "part number" or "stock code"),[8] were ordered by Kaman through separate purchase orders, and were stored in different areas of Kaman's facility.

On January 15, 2003 and January 30, 2003, Kaman ordered EB 401-2 bellows motors for use in FMU-143 fuzes that were scheduled to be shipped in June and July of 2003. Kaman's supplier was not able to meet the orders, however, creating a situation where Kaman could possibly fail to meet its contractual obligations to the Government. The testimony given by several of Kaman's employees as to what happened next varies widely.

Larry Streit, Kaman's Materials Manager, testified that he remembered attending a daily production meeting in which the issue regarding the shortage of EB 401-2 bellows motors came up.[9] (Streit Dep. at 50:1-6.) Streit does not recall ever discussing the option of postponing production of the Government's order until the EB 401-2 bellows arrived. (*Id*. at 52:13-20.) After

---

[8] Kaman assigned stock codes to fuze components using a system that incorporated the component's drawing number into the stock code. Generally speaking, the first 3 digits of the part number refer to the program, the next 5 digits refer to the drawing number, and the last 3 numbers designate a "piece part number." (Vita Dep. at 15:15-19.)

Parts used on the JPF program were assigned stock numbers beginning with an "8." Stock number 80201533550 referred to the EB 401-3 bellows motors allocated to the JPF program. The middle digits of the stock number ( 8020<u>1533</u>550) refer to the drawing number associated with the JPF program (933<u>1533</u>). (*See id*. at 14:21-15:3.)

In contrast, parts used on the FMU-143 program were assigned stock numbers beginning with a "7." Stock number 70213781551 referred to the new EB 401-2 bellows motors allocated to the FMU-143 project. The middle digits of the stock number (702<u>13781</u>551) refer to the drawing number associated with the FMU-143 program (1379AS781).

[9] According to Streit, all of Kaman's operational managers would have attended the production meeting, including James Lobban, Robert Monahan, Chris Gardner. (Streit Dep. at 50:11-25.)

the meeting, Streit searched Kaman's computerized records system (called "SYSPRO") for any available EB401-2 bellows in other fuze programs. Bellows associated with the JPF program came up, but did not include a drawing number. As a result, Streit asked Diane Cowan, Kaman's Configuration Manager for the JPF program, whether the JPF and the FMU-143 programs were using the same bellows. Cowan did not answer Streit immediately, but informed him later that the JPF and FMU-143 programs were using "identical bellows." (*Id*. at 53:25-54:1.) Streit did not ask Cowan whether the two bellows had the same drawing number. (*Id*. at 55:1-2.) Streit then spoke with James Lobban, Kaman's site operations manager, about taking EB 401-3 bellows from the JPF program and using them in the FMU-143 program. According to Streit, Lobban agreed that Streit could make the change, and further confirmed that it would not impact the JPF program. Streit did not speak with anyone other than Cowan and Lobban about the substitution.[10]

Cowan's testimony was generally consistent with Streit's version of events. Specifically, Cowan testified that she does not remember anyone asking her whether it "was okay to take bellows from the 152 program and use them in the 143 program." (Cowan Dep. at 73:16-20.)[11] Rather, Cowan remembers having a general discussion with Streit about bellows and telling him that the JPF and FMU-143 programs used the "same" bellows. (*Id*. at 73:25-74:22.)[12] Streit never told her why he was asking about the bellows. (*Id*. at 80:21-23.)

---

[10] There are no documents memorializing Streit's conversations with either Cowan or Lobban. (*Id*. at 56:18-23.)

[11] Cowan testified that she attended staff meetings once or twice a week. However, she does not recall any discussion at the staff meetings about the lack of bellows for the FMU-143 program in the Spring of 2003. (Cowan Dep. at 79:1-13.)

[12] According to Cowan, her discussion with Streit occurred in April 2004. (*Id*. at 90:9-14.)

Although Cowan admitted that she had no written document that stated that the two programs were using the same bellows, she testified that she received verbal verification from her supervisor and Kaman's engineering manager, Don Wright. Specifically, Cowan testified to the following:

> Q: What did you say to Mr. Wrignt?
>
> A: "We're using 143 bellows on the JPF, correct?"
>
> Q: And what did he say?
>
> A: "That's my understanding."

(*Id*. at 92:1-5.)

In contrast, Wright testified that he did not remember anyone asking him about whether bellows could be taken from the JPF program and used in the FMU-143 program. (Wright Dep. at 26:14-18.) Wright further testified that he would not have had sufficient knowledge to answer such a question in May-July 2003. (*Id*. at 28:5-11.) Even assuming that he was asked such a question, Wright testified that he would not consider "that's my understanding" to be a sufficient justification for "taking bellows motors from one fuze program and sticking them in another fuze." (*Id*. at 14-15.)

Similarly, Lobban does not recall having any discussions with Streit or Cowan about the shortage of bellows for the FMU-143 program or using JPF bellows for the FMU-143 program. (Lobban Dep. at 18:8-19:16.)

Thereafter, on April 11, 2003, Streit effected a transfer of 250 bellows motors from the JPF stock number 80201533550 to FMU-143 stock number 70213781551. Streit effected a second

transfer of 819 bellows from JPF stock to FMU-143 stock on May 13, 2003. Streit recorded the transfer in SYSPRO. The JPF bellows were also re-labeled with the FMU-143 stock number.

Kaman later put EB 401-3 bellows motors into some or all of the 1,081 FMU-143 fuzes it supplied to the Government between June 5, 2003 and July 25, 2003. These shipments were made in four lots: G052-001, G046-003, D046-001, and F046-002. Kaman did not report this substitution, nor did it request a change order, deviation, or other authorization to make this substitution.

Each of the four lots shipped to the Government was accompanied by a DD Form 250 ("DD250") and a Certificate of Conformance ("CoC"). The contract states that a DD250 must be submitted with all requests for payment. The CoCs were signed by Robert Monahan, Kaman's Quality Assurance Manager, and state that the lot of fuzes "conform[ ] with all requirements of the contract." (Gov. Resp., Ex. 45.) Each CoC also states that "[t]he items covered by this certificate perform to all contract requirements." (*Id*.) Monahan submitted the DD250's and the CoCs to the Government for the purpose of obtaining payment. (*See id*.) ("This certificate is made for the purpose of inducing payment and with knowledge that the information and certification may be used as a basis for payment"). The Government later paid Kaman $2,004,499.00 for the four lots of fuzes.

On August 18, 2004, Paul Harrison, a Quality Assurance Specialist with the Defense Contract Management Agency, discovered the substituted EB 401-3 bellows motors. Kaman later acknowledged the substitution in September of 2004. The Government has since quarantined all 1,081 fuzes shipped.

The Government brings this action alleging that Kaman submitted false claims for payment for the four lots of FMU-143 fuzes. The Government's claims include presenting false claims in violation of 31 U.S.C. § 3729(a)(1) and (a)(2) (Count I), and making false statements in order to receive payments from the United States in violation of 31 U.S.C. § 3729(a)(2) (Count II).[13] In addition, the Government asserts common law claims of breach of contract (Count III) and unjust enrichment (Count IV).

**II. Standard**

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1351-52 (M.D. Fla. 2003). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

---

[13] Pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Congress made a number of changes to the FCA, including renumbering and amending Sections 3729(a)(1) and (a)(2). Pub. L. No. 111–21, 123 Stat. 1617 (2009). In their Joint Pretrial Statement, both parties agree that the pre-FERA verison of the FCA is applicable to this case. (Doc. 85 at ¶ 11.)

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324-25 (internal quotations and citations omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

### III. Analysis

The FCA, in relevant part, imposes liability on a person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. § 3729(a)(1)-(2).

Kaman argues that the Government's FCA case fails as a matter of law on several grounds. The Court will address each argument in turn.

**A. Knowledge**

Kaman argues that the Government has failed to present any evidence that Kaman "knowingly" submitted false information. Specifically, Kaman contends that Streit's transfer of bellows from the JPF to the FMU-143 program was not an intentional substitution of a different bellows motor. Rather, Kaman maintains that Streit thought he was transferring the same part from one program to another.

Under the FCA, a person acts "knowingly" if he or she "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). No proof of specific intent is required. *Id.*

The "knowingly" element of an FCA claim provides the requisite degree of scienter and carries forth Congress's intent that the FCA does not punish "honest mistakes or incorrect claims submitted through mere negligence." *United States ex rel. Hefner v. Hackensack Univ. Med.*, 495 F.3d 103, 109 (3d Cir. 2007). However, in defining "knowingly," Congress attempted "to reach what has become known as the ostrich type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." S. Rep. No. 99-345, at 21 (1986). Congress adopted "the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek." *Id.* at 20; *see also id.* at 7 (discussing the importance of individual responsibility because the government has limited resources to police fraud).

Considering the evidence as a whole, and viewing the evidence in the light most favorable to the Government, the Court concludes that genuine issues of material fact exist as to whether Kaman "knowingly" submitted false claims in violation of the FCA. In particular, an issue of fact exists as to whether Streit made any inquiry at all before substituting the bellows. Streit's and Cowan's testimony was not corroborated by documentary evidence or by Lobban or Wright. Further, Streit's inability to locate the drawing number for the JPF bellows is somewhat inexplicable given the fact that a portion of the drawing number is in the stock code and is included on all purchase orders. (*See* Chris Gardner Dep. at 14:7-10, 16:6-12); (see also Kaman Ex. 27, purchase order issued in 1999 for JPF program, which specifically identifies 9331533 as the drawing number associated with the program). Further, a genuine issue of material facts exists as to whether management was even told about the shortage of bellows for the FMU-143 program. Specifically, Lobban and Gardner testified that they could not remember any conversations of such a nature. Moreover, Streit's testimony is internally inconsistent in that he began his search for parts by drawing number and also recognized that if the drawing numbers for parts were the same, they are interchangeable, but, at the same time, he did not ask anyone if the JPF and FMU-143 programs used the same drawing number. (*See* Streit Dep. at 53:1-4, 55:1-2, 74:13-16.)[14]

---

[14] Additionally, the Court rejects Kaman's characterization of the Government's argument as attempting to use the collective knowledge theory to establish the requisite scienter in this case. (*See* Doc. 65 at 18-21.) The collective knowledge theory allows "a plaintiff to prove scienter by piecing together scraps of innocent knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claim seeking government funds." *United States ex reI. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 918 n. 9 (4th Cir. 2003) (internal quotations omitted). Here, the Government does not ask the Court to add up individual pieces of innocent knowledge to find the requisite collective scienter. Rather, the Government seeks to establish the knowing requirement by showing that at least one employee knew or should have known that a false statement was being submitted to secure

**B. Materiality**

Kaman argues that the Government's FCA claims fail because it has failed to prove the materiality requirement of the statute. Even though Kaman admits that it submitted CoCs to the Government for each of the four nonconforming shipments at issue in this case, it argues that the CoCs were not required by the Contract and, thus, could not have been material to the payment.

The materiality element requires that the false or fraudulent conduct or statements be material to the claim for government payment. Although the Eleventh Circuit has not yet addressed the proper standard for assessing the materiality of a false statement under the FCA, both parties appear to agree that "a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (internal quotations omitted).

In the instant case, there is evidence before the Court that the use of the proper bellows motor was material to the Government's decision to pay the claims at issue. Specifically, the Government has put forth evidence showing that it would not have signed the DD250s, or paid Kaman for the four lots of fuzes, had it known about the substitution of bellows motors in the FMU-143 fuzes. Rather, the evidence suggests that had Kaman submitted truthful forms, indicating that the bellows were not complaint, it would not have gotten paid. Indeed, after it was

---

government funds. *Id*. at 919.

Further, whether Monahan knew that the DD250s were false when they were submitted to the government is immaterial. A corporation can be held liable under the FCA even if the verifying employee was unaware of the wrongful conduct of other employees. *See Grand Union Co. v. United States*, 696 F.2d 888 (11th Cir. 1983).

made known to the Government that the FMU-143 fuzes did not use EB 401-2 bellows, all four lots were quarantined. (*See* Michele Guidry Dep. at 31:15-32:17.)

Therefore, the Government has presented sufficient evidence to withstand Kaman's motion for summary judgment on the question of materiality.

**C. Falsity**

Lastly, Kaman contends that there is no evidence of falsity as the CoCs certified compliance only with the Contract's performance requirements, and not the design requirements as the Government contends. (*See* Doc. 65 at 24) (citing Monahan Decl. at ¶ 4).

Kaman's argument is misplaced. The Contract required Kaman to use bellows that met the "unique FMU-143 requirements," as set forth in Mod. 14. The evidence indicates that the bellows delivered did not actually meet the specifications of the Contract. (*See* Guidry Dep. at 32:9-17.)[15] The Contract, as it was written, is not a performance Contract as Kaman now suggests. Thus, although the bellows that were delivered may have been "just as good" as the fuzes specified in the Contract, the Government did not agree to accept those fuzes. At this stage, Kaman's attempts to characterize the bellows delivered as "just as good" as those requested are irrelevant. *See United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir. 1972) ("The mere fact that the item supplied under contract is as good as the one contracted for does not relieve defendants of liability if it can

---

[15] In addition, Kaman's documents demonstrate that the EB 401-3 bellows exceeded the velocity requirements for the FMU-143 fuze as set forth in Mod. 14. Further, Kaman's internal documents support a conclusion that the EB401-2 and EB 401-3 fuzes were not interchangeable. (*See* Gov. Resp., Ex. 32, Letter authored by Anna DiGiacomo, Kaman's contract manager) ("The bellows transfer made between FMU-143 and JPF was an intentional transaction – it was a conscious decision at the time with the (incorrect) belief by management that the –2 and –3 bellows were interchangeable.") (emphasis added).

be shown that they attempted to deceive the government agency."); *Chemray Coatings Corp. v. United States*, 29 Fed. Cl. 278, 284 (Fed. Cl. 1993) (holding that "[t]he FCA does not recognize the 'just as good' exception").

Accordingly, the Government has produced sufficient evidence of the falsity of the claims submitted by Kaman to withstand summary judgment.

**IV. Conclusion**

Based on the foregoing, it is ORDERED that:

Defendant Kaman Precision Products, Inc.'s Motion for Summary Judgment (Doc. 65), filed on June 20, 2011, is DENIED.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on August 30, 2011.

_____
**GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record

Unrepresented Party